In the Matter of **FAGO CONSTRUCTION CORPORATION, Bankrupt.**

No. 36963.

United States District Court
W. D. New York.

Nov. 18, 1957.

---

William R. Emblidge and Edward H. Wolkind, Buffalo, N. Y., for trustee.

Brown, Kelly, Turner & Symons, Buffalo, N. Y. (Mark N. Turner, Buffalo, N. Y., of counsel), for Massachusetts Bonding & Ins. Co.

John O. Henderson, U. S. Atty., for Western District of New York, Buffalo, N. Y. (John C. Broughton, Asst. U. S. Atty., Buffalo, N. Y., of counsel) for the United States.

Jacob K. Javits, Atty. Gen., of the State of New York (Matthew A. Tiffany and Michael P. Geraci, Asst. Attys. Gen., of counsel), for the People.

Hyman Karnofsky, Buffalo, N. Y., for bankrupt.

MORGAN, District Judge.

This matter is before the District Court on three distinct petitions by the United States, the State of New York and the Massachusetts Bonding & Insurance Company, each appealing from a decision of the Referee in Bankruptcy, the Hon. James R. Privitera, dated September 12, 1956.

On or about May 15, 1947, the Fago Construction Corporation, hereinafter referred to as the corporation, entered into a flood control contract with the United States Government at Bath, New York, and for a V.A. Hospital Contract in Buffalo, New York. On May 15, 1947, the Massachusetts Bonding & Insurance Company became surety upon the bankrupt's corporation performance and payment bonds as required under the Miller Act, Title 40 U.S.C.A. Section 270a, b, c, d. In April 1948, the Fago Construction Corporation advised the surety that it was in trouble financially and could not proceed with both jobs without financial assistance. As a result, the bankrupt corporation gave the surety a collateral chattel mortgage on its equipment, and Dominic S. Fago, the principal stockholder, gave a collateral real property mortgage on some property owned by him. The surety further presented the following program for the bankrupt corporation. Since the Bath Flood Control job was a Federal contract, and since the surety was not entitled under the Assignment of Claims Act, 41 U.S.C.A. § 15, to take a direct assignment of contract balances, the bankrupt executed two documents, one being a letter of authority directed to the United States Engineer in charge to send all checks for estimates to the surety's claim manager at Buffalo, N. Y., J. Herbert Crafts; the other being a "power of attorney" authorizing Mr. Crafts to endorse checks payable to the bankrupt on each job. The letters of authority were filed with the U. S. Engineer's office in Baltimore and Buffalo, while the power of attorney to endorse checks was filed with the Treasury Department. A joint bank account in the name of Mr. Crafts and the bankrupt's secretary, Mr. Bieniek, was opened, and into this account, all funds were deposited with all checks signed by Messrs. Crafts and Bieniek. The agree-

ment further provided that as the work progressed on both jobs, money becoming available under the two contracts would be deposited in the special account. Under this arrangement, $79,499.12 in contract balances was deposited in the joint account. However, Dominic Fago managed to obtain a check from the United States Government for $25,893 which he did not deposit in the joint account. Of this amount, $14,000 wound up in Fago's personal account, $9,500 of which was used to purchase land for another of his corporations, Permanent Residences, Inc. This transaction occurred prior to the bankruptcy. After the bankruptcy, the trustee obtained a blanket mortgage from Permanent Residences, Inc. and was eventually paid in full plus interest.

During the period from January 22, 1947 through September 28, 1948, the bankrupt corporation was delinquent in the payment of a variety of Federal Taxes aggregating $47,168.60. Notice of this assessment was filed in the office of the Clerk of the United States District Court for the Western District of New York on December 15, 1948 and on January 24, 1949. A progress payment of $51,868.41 became due to the corporation, but the collector exercised his paramount right of setoff and applied it toward the payment of the delinquent taxes which were satisfied of record on January 26, 1949. On March 31, 1949, an involuntary petition for an adjudication in bankruptcy was filed against the Fago Construction Corporation with an adjudication of bankruptcy following shortly thereafter.

The appeal concerns the following claims:

1. Claim No. 90 for New York State franchise taxes for the following periods: April 25, 1947 to January 31, 1948, tax of $564.75 plus $28.25 interest; for period February 1, 1948 to January 31, 1949, tax of $284.83; February 1, 1949 to March 31, 1949, tax of $25, for a total tax of $901.83.

2. Claim No. 109 of State of New York for taxes under Article 12A of New York State Tax Law in the amount of $14.26.

3. Claim No. 140 for New York State unemployment insurance taxes for $7,913.68; of this amount $7,791.18 was for the period July 1, 1947 to December 31, 1948. A tax warrant was filed for this amount of April 11, 1949 in the Clerk's Office of Erie County.

4. Claim No. 101 by United States for unemployment and withholding taxes in the amount of $19,469.66 which accrued during the quarters ending December 1947, September 1948 and December 1948. This claim was filed on July 5, 1949.

5. Claim No. 121 by United States for $11,696.74 for unemployment taxes (FUTA) accruing during the year 1947–1948. This claim was filed on September 27, 1949.

6. Claim No. 30 by the Massachusetts Bonding & Insurance Company for various causes of action for $217,584.06, including its alleged right to subrogation of the Government's claims.

The learned Referee decided on the following order of distribution:

First: The payment of all administration costs and expenses and allowances to be made to the parties and attorneys entitled thereto.

Second: Payments of the Franchise Taxes owing to the State of New York under Claim No. 90.

Third: Payment of the balance remaining to the Massachusetts Bonding and Insurance Company on its claim of subrogation to the rights of the United States and priority.

The learned Referee in his opinion states, "Due to some difficulty, the Surety assumed the financing and completion of the Bath job in April 1948 and commenced to advance various and substantial sums of money." Nowhere in the opinion does the Referee find as a specific fact that the bankrupt left the job and did no further work as in the case of Colusa-Glenn Production Credit Association v. Phoenix Ins. Co., D.C., 145 F.Supp. 844, or was in default by

failure to make payments to laborers and materialmen as in Fidelity & Deposit Company of Maryland v. New York City Housing Authority, 2 Cir., 241 F.2d 142. If that be so, it follows that Fago, the contractor, had a right to the withheld funds. It must then be concluded that the line of cases following United States Fidelity & Guaranty Co. v. Triborough Bridge Authority, 297 N.Y. 31, 74 N.E. 2d 226 and Aetna Casualty & Surety Co. v. Horticultural Service, Inc., 2 A.D.2d 963, 158 N.Y.S.2d 750, do not apply. Also, it has been established that the surety is not liable for withholding and F.I.C.A. taxes prior to the principal's default, United States Fidelity & Guaranty Co. v. United States, 10 Cir., 201 F.2d 118, where the Court refused to expand the obligations of the surety under the Miller Act to cover the aforesaid withholding taxes.

As stated above, Fago executed a collateral chattel mortgage on its equipment and a collateral real property mortgage on property owned by Dominic Fago personally before the advance of any monies by the surety, who then set up an elaborate program to control the bankrupt. During the time that the surety had Mr. Crafts endorsing all checks that were paid out by the bankrupt, the surety claims it had no knowledge that Fago was not paying the withholding and employment taxes that were deducted out of the wages of the laborers employed to complete the jobs. The surety had chosen to stand in the place of the bankrupt in order to receive monies due the corporation from the Government under its contract. The surety had access to Fago's corporate books and yet claims ignorance about non-payment of the withholding and other taxes.

Surely, if the bankrupt had walked off the job and defaulted irrevocably, and if the surety had undertaken to complete the job under its performance bond, there could be no argument that the surety would be exempted from paying the withholding, employment and other taxes as incidental expenses to the operation of any business enterprise. Foreseeing that

a strong argument might be made against it, the surety now disclaims all knowledge and says, "But we are subrogated under the tax assessment filed on December 15, 1948 and paid by a setoff of a progress payment of $51,868.41 in January 1949." Let us examine the argument presently.

The doctrine of subrogation was enunciated by the Supreme Court in 1888 in Aetna Life Insurance Company v. Town of Middleport, 124 U.S. 534, 8 S.Ct. 625, 31 L.Ed. 537 as follows:

In equity the doctrine of subrogation requires (1) that the person seeking its benefit must have paid a debt due to a third party before he can be substituted to that party's rights and (2) that in doing this, he must not act as a mere volunteer, but on compulsion to save himself from loss by reason of a superior lien or claim on the part of the person to whom he pays the debt, as in cases of sureties, prior mortgagees. The right is never accorded in equity to one who is a mere volunteer in paying a debt of one person to another.

The argument of the surety, one adopted by the Referee, is that the money used in the setoff of $51,868.41 by the Government belonged to the surety, because it was the surety's money that produced and created the progress payments. While it may be true that the surety advanced funds to the bankrupt, nevertheless, under the Miller Act, an assignment of funds to the surety was unlawful. It follows then that the funds belonged to the bankrupt and, because of reasons advanced previously, in the opinion of the learned Referee, the surety was not liable to the Government under its bonds for the payment of taxes. However, it must be remembered that Fago, and not the surety, continued to operate the business. Furthermore, the withholding taxes and social security taxes were originally wages deducted, prior to payment, to the laborers and workers. Section 1622 and 1623, Title 26 U.S.C.A. require the collection of withholding taxes by all employers. Section 3661 of Title 26 stated that "When-

ever any person is required to collect or withhold any internal-revenue tax from any other person and to pay such tax over to the United States, the amount of the tax so collected or withheld shall be held to be a special fund in trust of the United States." The debt which Fago owed the Government was not a debt in the true sense of the word, but the payment over of a trust fund held by Fago for the Government. If that be so, the surety cannot validly claim that the setoff of $51,864.51 was its money, being used to pay the debt of Fago, and thereupon, it was subrogated to the right of the Government. In re Baltimore Pearl Hominy Co., 4 Cir., 5 F.2d 553 does not apply because of a different factual situation. In a proper case, a surety may be subrogated to the right of the United States, section 193, Title 31 U.S.C.A., but, in the opinion of the Court, neither the statutory provision nor the doctrine of equitable subrogation entitle the surety here to claim to be subrogated to the setoff of $51,864.41. United States v. Munsey Trust Co., Receiver, 332 U.S. 234, 67 S. Ct. 1599, 91 L.Ed. 2022.

To allow the surety to be subrogated to the $51,864.41, would do violence to the Munsey Trust Doctrine. Carried to its logical conclusion, the subrogation, if permitted, would effectively limit the right of the United States to offset claims against a contractor who has failed to remit withheld taxes. Returns for unemployment taxes must be filed within thirty (30) days following the close of the taxpayers' year, while returns for withholding taxes and social security taxes must be filed within thirty (30) days following the close of the previous quarter. How is the Government to know the amount of the tax when a return is not legally due until after the close of the quarter, or calendar year, as aforesaid? Suppose in the instant case, the Government wanted to offset more of the progress payments. I suppose the surety would advance the same argument as it has in the instant case and declare it has a prior right to the progress payment because it is subrogated to the tax lien of the United States, which would, of course, be prior in time.

Section 104, Title 11, sets forth the priorities to be observed before distribution to general creditors, as follows: (1) actual and necessary costs and expenses of preserving the estate subsequent to filing the petition; (2) and (3) which are not applicable; (4) taxes legally due and owing by the bankrupt to the United States or any state or subdivision thereof. The claims of the United States for withholding and unemployment taxes on wages earned and paid prior to bankruptcy were entitled a priority as taxes, but not as costs of administration. In re John Horne Company, 7 Cir., 220 F.2d 33. The same taxes, if deducted from wages subsequent to a bankruptcy, and while the debtor was operating as debtor-in-possession, would be entitled to a priority under section 104, sub. a (1). In re John Horne Company, supra; Pomper v. United States, 2 Cir., 196 F.2d 211.

Under section 104 U.S.C.A. Title 11, the United States Government must be granted priority and its tax claim allowed. The surety cannot prevail because of Section 107 U.S.C.A. Title 11, since the lien theory of subrogation does not apply in this situation, in the opinion of this Court.

As previously stated, the surety claims that $9,500 out of the progress payment of $25,895 was allegedly converted by the bankrupt. There is no specific finding by the learned Referee on this particular point. Needless to say, the conversion action was severed as to the bankrupt corporation so that no determination exists that the Fago Construction Corporation was guilty of an alleged conversion.

It is the opinion of this Court that distribution of the bankrupt's assets should proceed as follows:

First: Payment of all administration costs, expenses and allowances to be made to the parties and attorneys entitled thereto.

Second: Payment of the franchise tax owing to the State of New York under Claim No. 90.

Third: Payment of Claims No. 101, 121, 109 and 140. Only so much of Claim No. 140 should be paid as will not duplicate No. 121.

Fourth: Claim No. 30 of the Massachusetts Bonding Company as a general creditor, including the claim for $9500.

The opinion of the Referee is affirmed as to the First and Second orders of distribution and reversed in part in accordance with this opinion. Present order on notice.